UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ERIN F. MURRAY AS EXECUTRIX AND PERSONAL REPRESENTATIVE OF THE ESTATE OF TIMOTHY M. MURRAY,<br><br>                  Plaintiff,<br>vs.<br><br>AET INC. LTD. *in personam* and the MV EAGLE TURIN, *in rem,*<br><br>                Defendants. | Case No.:  1:21-cv-03360 (TMR)<br><br>**SECOND VERIFIED AMENDED COMPLAINT** |

Plaintiff, **Erin F. Murray**, as Personal Representative and Executrix of the Estate of her late husband, **Timothy M. Murray**, brings this complaint against the defendants seeking damages resulting from the August 5, 2020 death of her husband and respectfully alleges upon information and belief:

## Jurisdiction and Venue

1. Jurisdiction arises under 28 U.S.C. §1333 admiralty and general maritime law and the Death on the High Seas Act ("DOHSA") 46 U.S.C. §30301.

2. On August 5, 2020, decedent, Timothy M. Murray, a ship's pilot, was caused to fall from the MV EAGLE TURIN, as he attempted to board the MV EAGLE TURIN, via a pilot ladder, resulting in grave bodily injuries and his death.

3. At the time of the herein incident, the MV EAGLE TURIN was underway, the nearest points of land were New York (6.9 nautical miles away) and New Jersey (7.5 nautical miles away). The parties have stipulated that the incident occurred approximately seven (7)

1

nautical miles off the shore of New York, at or near the Pilot Station, as designated on the Official NOAA Charts.  Such location is more than 3 nautical miles from any point of land.

4.    Personal jurisdiction exists and has been consented to over the EAGLE TURIN *in rem* and over AET INC. LTD *in personam* by virtue of a Letter of Undertaking ("LOU") dated August 31, 2020, issued by United Kingdom Mutual Steam Ship Assurance Association (Europe) Limited, agreeing to appear on behalf of the vessel and her owner(s) without any jurisdictional defense in the U.S. District Court for the Southern District of New York, in lieu of plaintiff arresting the vessel. The LOU stands as substitute security for plaintiff *in rem* claims against the vessel.

**The Parties**

5.    Plaintiff, Erin F. Murray, is the widow of Timothy M. Murray ("Captain Murray" or "decedent"), and the mother of their five infant children; B.M. (born 2009), R.M. and G.M (born 2012), J.M. (born 2014), and E.M. (born 2016).

6.    Captain Murray was a Sandy Hook Ship's Pilot who suffered a fatal fall on August 5, 2020, while climbing a pilot ladder to board the EAGLE TURIN.

7.    On March 1, 2021 plaintiff was appointed Executrix of decedent's Estate by the Surrogate's Court, County of Nassau, State of New York.

8.    At all relevant times plaintiff and decedent were residents and citizens of the State of New York.

9.    AET, at all relevant times, was a foreign corporation or other business entity organized and existing under foreign law having an office and place of business at Cumberland House, 1, Victoria Street, Hamilton, HM 11, Bermuda.

10. EAGLE TURIN (at times referred to as "vessel") is a Singapore flagged crude oil tank vessel, assigned IMO No. 9360465, and having the following principle dimensions: 809.7 feet length; 137.7 feet beam; and 69.9 feet depth.

11. AET, at all relevant times, was the registered owner, and/or ship manager, and/or commercial manager, of a fleet of approximately 20 crude oil tankers each having a name commencing with "EAGLE".

12. AET, at all relevant times, has been in the business of transporting crude oil from oil extraction facilities to refineries in various ports worldwide, including the United States of America.

13. AET, at all relevant times, was the owner of the tank vessel EAGLE TURIN.

14. AET, at all relevant times, managed, and/or operated, and/or controlled, the EAGLE TURIN.

15. AET, at all relevant times, was the ISM Manager of the EAGLE TURIN.

16. AET, at all relevant times, was the Commercial Manager of the EAGLE TURIN.

17. AET, at all relevant times, hired the master, officers and crew of the EAGLE TURIN.

18. At the time of incident, August 5, 2020, the EAGLE TURIN was at the pilot boarding location in preparations to embark Captain Murray, for docking at an oil facility in the Port of New York and New Jersey, United States of America.

**Background on Piloting**

19. Captain Murray was a 'sea pilot', who navigated ocean-going ships in and out of the Port of New York and New Jersey. He had been climbing pilot ladders since 2007, the last eight (8) years of which were as a Professional Pilot. The totality of his experiences

3

encompasses embarking, disembarking and piloting over a thousand ships into and about New York Harbor and the Port of New York and New Jersey.

20. Captain Murray was a member of the Sandy Hook Pilots Association ("SHPA"). SHPA provides pilotage services to ships that are required by law to embark a licensed pilot to enter or leave the Port of New York and New Jersey.

21. To facilitate embarkation and debarkation of pilots, SHPA maintains a vessel, 24 hours a day / 7 days a week, 'on station' in the vicinity of Ambrose Light, which deploys or dispatches pilots to inbound vessel via smaller launch boats.

22. In the late evening of August 5, 2020, Captain Murray debarked from the NEW JERSEY, which was the pilot vessel on station, and was taken by the launch boat AMERICA to meet EAGLE TURIN.

23. The launch boat AMERICA came alongside the EAGLE TURIN shortly before 10:30 pm (22:30 hrs.).

24. The means provided by EAGLE TURIN to allow Captain Murray to embark was the "pilot ladder" depicted herein in Image No. 1 below.

*Image No. 1.  EAGLE TURIN pilot ladder*



25. Image No. 1, above, was taken from the launch boat YANKEE, minutes after the fatal incident (fall), while the launch boat AMERICA was heading with Captain Murray onboard to Staten Island, to obtain emergency medical treatment for Captain Murray.

26. U.S. Coast Guard summaries of crewmember interviews report that immediately before his fatal fall, Captain Murray was at or near the top of the pilot ladder depicted in Image No. 1, above.

### The Hazards of Climbing Pilot ladders

27. The hazards of Climbing Pilot ladders have for many years been reported frequently by:

    a. International and domestic governmental agencies responsible for Maritime Safety such as the International Maritime Organization (IMO), and the U.S. Coast Guard,

    b. Umbrella pilot associations such as the International Maritime Pilot Association (IMPA), the American Pilot Association (APA), the European Maritime Pilots Association (EMPA), the United Kingdom Maritime Pilots Association (UKMPA), and other maritime nations,

    c. Marine Insurers and Underwriters, including the one that provided the above referenced Letter of Undertaking, and

    d. Various maritime journals and publications concerned with vessel and crew safety including pilots.

28. Since circa 2002 the International Pilot's Maritime Association (IMPA) has published a "Safety Campaign" at the behest of the International Maritime Organization (IMO). The stated purpose being to investigate injuries and fatalities resulting from non-conformities and deficiencies in pilot ladder rigging, equipment, and pilot transfer arrangements.

29. The 2019 Campaign contains the following statement:

6

> "Boarding and disembarking of vessels at sea remains a perilous activity undertaken by maritime pilots around the world every minute of the day. The purpose of pilots is to enhance the safe and efficient movement of seagoing vessels during the most hazardous part of their voyage in congested and complicated waters so that they can pursue their commercial purpose. Does the world's shipping community not owe the persons undertaking this perilous task a simple duty of care by providing pilot boarding arrangements that meet the minimum standards set out in SOLAS V/23 and A1045(27)."

30. Statistics compiled by the 2019 Safety Campaign show that 12.8% of vessels failed to provide compliant pilot boarding arrangements.

## International Regulation of Pilot Transfer Arrangements

31. The International Maritime Organization (IMO), a United Nations agency, has the primary purpose of promoting maritime safety through international regulations, which are adopted under conventions agreed to by signatory maritime nations, including the United States of America.

32. International Regulations and Resolutions pertaining to pilot transfer arrangements are contained in Safety of Life at Sea Conventions (SOLAS), commencing with SOLAS (1914) and its successive forms and versions. Current Pilot transfer arrangements are contained in SOLAS Chapter V Reg 23 and Resolution A. 1045(27) and A.1108.

33. SOLAS Regulations and Resolutions are not "fixed" but incorporate existing and developing industry "best practices", "good and proper standards of marine practice", "safety standards", codes and guidelines, and recommendations of classification societies and the maritime industry, to ensure that pilot transfer arrangements continue their purpose of enabling pilots to embark and disembark safely. SOLAS in the context of the aforementioned incorporation is hereinafter referred to as "SOLAS Instruments".

7

### The Pilot Line a/k/a 'Pilot Mark'

34.     All versions of SOLAS Instruments from SOLAS (1960) to current SOLAS (2012) contain provisions restricting the height a pilot can be required to climb above the surface of the water on a pilot ladder.

35.     This limitation, which is enshrined in SOLAS Instruments is 9 meters, which is measured from the surface of the water to the access point on the vessel.

36.     The concept of the Pilot Line came into existence on the recommendation of the International Maritime Pilot's Association following the death of Captain Laurence Kerr in September 1974.  Captain Kerr, a member of the Trinity House Falmouth pilots, fell to his death, leaving a wife and four children, while climbing a pilot ladder more than 9 meters to board the ferry vessel EAGLE.

37.     EAGLE TURIN has a Pilot Line painted on her hull.  The Pilot Line is the white vertical line with a red rectangle, towards the right of the pilot ladder, as which can be seen near the bottom of Image No. 1 above.

38.     Attached herein as **Exhibit No. 1** is an IMPA poster published in 2012, which explains the significance of the Pilot Line, and when a pilot ladder can be used.

39.     A copy of the IMPA poster (i.e. **Exhibit No. 1**), was on the bridge of EAGLE TURIN at the time of herein incident and prior thereto.

40.     The panel on the left side of the poster shows it is permissible to use a pilot ladder <u>only</u> when the freeboard to the point of access is 9 meters or less.

41.     The next adjacent panel of the poster shows the alternative arrangement that must be used when the freeboard to the point of access exceeds 9 meters, which is a "combination

arraignment" consisting of an accommodation ladder and a pilot ladder. (The Pilot Line is also depicted in this panel.)

42. The significance of the Pilot Line is that if any part of the color "red" is showing, the '9 meter' SOLAS limit has been exceeded, thereby preventing use of a pilot ladder and requiring a combination arrangement.

43. At the time the pilot launch AMERICA came alongside EAGLE TURIN, to permit Captain Murray to embark, the Pilot Line was displaying "red", as can be plainly seen near the bottom of Image No. 1 above.

44. EAGLE TURIN did not provide a combination arrangement for Captain Murray's embarkation, negligently causing and/or contributing to Captain Murry's falling from the vessel as he attempted to board the vessel via the provided pilot ladder.

### Safe, Convenient, Unobstructed Passage to the Point of Access on the Vessel

45. SOLAS Instruments require that the vessel provide Safe, Convenient, Unobstructed Passage, for any person embarking on, or disembarking from, the ship between the head of the pilot ladder and the ship's deck.

46. SOLAS Instruments also require that if the pilot's passage is through a gateway in the rails, that "adequate handholds" should be provided.

47. The type of access available to Captain Murray was a gateway access, through a section of the ship's handrails on the main deck.

48. EAGLE TURIN's gateway access did not have "adequate handholds". In its place was an opening through the handrails, with a hinged swing gate as depicted herein in **Exhibit No. 2** and **Exhibit No. 3**.

9

49.     EAGLE TURIN's handrails were not "adequate handholds" required by SOLAS Instruments.

50.     EAGLE TURIN's handrails were not "adequate handholds", but were deficient, defective and unseaworthy, as they were obstructed and encumbered, with four brackets welded on the inboard side of the handrail to secure the gate, and by a section of the gate immediately adjacent to the forward section of railing as shown in **Exhibit No. 2** and **Exhibit No. 3.**

51.     The handrail obstructions are in locations, which a pilot such as Captain Murray would seek to grasp, while attempting the critical transfer from the pilot ladder to the deck platform on the vessel.

52.     The handrail obstructions are located on the inboard side of the vessel and are not visible to a pilot outboard of the hull boarding from a pilot ladder, particularly in nighttime conditions.

53.     The handrail obstructions prevent obtainment of a proper grip, which is known as a "power grip".   (See Image No. 2 below.)

*Image No. 2. Power Grip*



**Power grip.** The individual's ability to wrap the fingers around an object and oppose the base of the thumb. In this grip, the force exerted by the fingers is approximately equal and opposite to that exerted by the thumb (See Fig. 19).

54. EAGLE TURIN's deficient, defective, and unseaworthy substitute handrails do not extend to the platform or the main deck but terminate a distance above the platform as seen in **Exhibit No. 2** and **Exhibit No. 3**.

55. The gaps between the lower part of the handrails and the platform are in locations which a pilot, such as Captain Murray, would grasp while transferring from the pilot ladder to the deck platform.

56. SOLAS instruments require that "handholds" should be rigidly secured to the ships structure.

57. EAGLE TURIN's deficient, defective, and unseaworthy substitute handrails are not rigidly secured to the ship's structure, but are instead part of an extended handrail system, which indirectly attaches to the ship's structure. (See **Exhibit No. 2** and **Exhibit No. 3**.)

58. The EAGLE TURIN's deficient, defective, and unseaworthy substitute handrails, negligently caused and/or contributed to Captain Murry's fall from the vessel as he attempted to board the vessel via the provided pilot ladder.

**U.S. Coast Guard Marine Casualty Investigation**

59. On August 6, 2020, a U.S. Coast Guard officer and other officials ("investigators") from U.S. Coast Guard, Sector New York, boarded the EAGLE TURIN at the Stapleton anchorage, New York, to conduct a marine casualty investigation.

60. The investigators requested the EAGLE TURIN's Chief Officer to present for inspection the same ladder used by Captain Murray at the time of incident.

61. The EAGLE TURIN presented for inspection a ladder manufactured by PTR Holland. Details of the manufacturer, including model, length and production date are identified in the metallic tag shown herein in **Exhibit No. 4,** which was affixed to the underside of one of the ladder's steps.

62. The subject PTR Holland ladder has twenty-eight (28) steps consisting of four (4) rubber steps (at the bottom), twenty-one (21) regular size steps, and three (3) large spreader steps.

63. The investigators requested EAGLE TURIN's Chief Officer to rig the pilot ladder involved in this incident exactly as it was rigged for Captain Murray.

64. **Exhibit No. 2, Exhibit No. 3**, and **Exhibit No. 5**, herein, are photos taken by the investigators and which purport to show the exact manner of rigging at the time of incident as represented by the Chief Officer.

12

65. **Exhibit No. 2, Exhibit No. 3**, and **Exhibit No.** 5, herein show six (6) regular steps lying over the platform and extending inboard to the main deck.

66. Accepting the Chief Officers' representation that the ladder was rigged with six (6) steps, inboard as indicated above, the unavoidable conclusion is that the remainder of the ladder which consists of twenty-two (22) steps (i.e. 28 less 6) was suspended outboard against the hull while Captain Murray was climbing.

67. **Exhibit No. 6** is a photo taken from the pilot boat YANKEE, minutes after the fatal incident. The photo shows that there are three (3) regular steps above the top spreader. Given the fact that the ladder has only twenty-eight (28) steps and based on a comparison of the photographs and simple math, the ladder was initially rigged with four (4) steps on the main deck, not six (6) steps as purported by the EAGLE TURIN Chief Officer.

68. Therefore, the unavoidable conclusion is that either the ladder dramatically jumped, shifted, or changed position by two (2) steps while Captain Murray was climbing; or the rigging presented to the Coast Guard inspectors was false; representing a conscious attempt to "avoid, evade, prevent, or obstruct compliance, in whole or in part, with a civil investigation" in violation of 18 U.S.C. 1505.

69. SOLAS Instruments require a vessel must provide "adequate arrangements for securing the pilot ladder." Adequate arrangements are intended to prevent movement, shifting, sliding or position change while a pilot is climbing.

### The Role of the Responsible Officer on Deck

70. SOLAS Instruments require that the rigging of the pilot transfer arrangements and the embarkation of a pilot shall be supervised by a "Responsible Officer".

71. The duties and responsibilities of the "Responsible Officer" during the hazardous evolution of a pilot climbing a 9-meter ladder are weighty and analogous to watch standing duties.

72. SOLAS Instruments require the "Responsible Officer" and his deck crew to be properly stationed at the pilot access location, to ensure the safety of the pilot from any problem or difficulty encountered by the pilot while climbing. These include, but are not limited to:

   a. Mishaps involving material deficiencies in any component of the rigging including the shackles, or the winch reel to which the side ropes were secured.

   b. Mishaps involving substandard seamanship in the rigging, such as caused by slippage of knots secured to the side ropes.

   c. Mishaps caused by deck obstructions such as the edge of the platform or platform step having the potential to snag a ladder step.

   d. Mishaps caused by movements of the vessel due to wind or seas, which twist, turn and adversely affect the suspended pilot ladder.

   e. Mishaps requiring adjustments to ladder rigging.

   f. Mishaps which are personal to the pilot such as a foot slipping off a dirty or slippery or broken step or broken chock, or slippage of a hand from a side rope, or incapacitation of the pilot due to an unexpected medical issue, or tiredness, weariness, or exhaustion after climbing 9 meters.

   g. Mishaps which result during the pilot's transfer from launch vessel to the pilot ladder requiring "man overboard" responses, as were experienced by pilots in the below videos: https://www.marine-pilots.com/videos/158246-best-pilot-ladders-for-safety-of-maritime-pilots. And,

h.    Mishaps which incapacitate a pilot while on the pilot ladder which require an emergency response by a Responsible Office and others on deck, highlighting the need for fall protection

(https://www.youtube.com/watch?v=Fe0Bn8xiZHQ&t=39s).

73.    U.S. Coast Guard interviews reveal that Third Officer Muhammad Fansuri was assigned the obligations of the "Responsible Officer".

74.    The U.S. Coast Guard interview of Third Officer Fansuri notes that he was initially positioned on the Pilot Transfer platform, but that he intentionally abandoned his responsibility by departing (moving away) from the platform moments before Captain Murray reached the top of the pilot ladder and was caused to fall.

### Fall Arrest System (i.e. Fall Protection Gear)

75.    The EAGLE TURIN was equipped with fall arrest system.  (See **Exhibit No. 4** and **Exhibit No. 7**.)

76.    Fall arrest systems are regularly used, whenever an unguarded exposure to a fall from a height exists, such as when lowering, retrieving or rigging a pilot ladder with the gate in the open position.

77.    At the time of incident, the fall arrest system was not worn by any crewmember to be ready to assist Captain Murray from any mishap such as is described above.

78.    At the moment Captain Murray fell from the ladder, the Responsible Officer – having abandoned his watch station – was not on the platform, and neither was any other crewmember in position at the handrail openings.

79. A properly positioned Responsible Officer and/or crewmember would have prevented Captain Murray's fall from the pilot ladder, and more so if outfitted with fall protection gear.

80. The failure of the Responsible Officer and or vessel crewmember from being at the platform and/or handrail opening, negligently caused and/or contributed to Captain Murry's fall from the vessel as he attempted to board the vessel via the provided pilot ladder.

### Fall, Transfer and Death

81. Tragically, Captain Murray's fall from the pilot ladder caused him to land on the steel deck of the launch boat AMERICA sustaining grave bodily injuries.

82. The crew of launch boat AMERICA provided whatever help, assistance aid and relief were within their limited means.

83. The AMERICA and the pilot vessel NEW JERSEY next headed towards each other, to allow other crewmembers to come aboard for further assistance, before the AMERICA speed towards Staten Island, New York. They were met by a NYC Fire Department vessel, manned by EMT personnel, who administered further medical treatment until Captain Murray was transferred to an ambulance to be taken to Staten Island University Hospital, Staten Island, New York.

84. An autopsy performed on August 7, 2020, by the Office of the Chief Medical Examiner of New York City determined the cause of death was "blunt impact injuries to head, torso and upper extremities". The manner of death described was "accident (fell)".

### FIRST CAUSE OF ACTION FOR WRONGFUL DEATH ALLEGING UNSEAWORTHINESS AND UNSEAWORTHINESS PER SE UNDER DOHSA

85. Plaintiff repeats the allegations contained in paragraphs 1 to 84, with the same force and effect as if fully set forth herein.

86. At all relevant times, decedent was a compulsory pilot, "invitee" and independent contractor, not subject to selection and control of defendants, who performed navigation functions essential to the mission of the EAGLE TURIN, and who was exposed to maritime perils and hazards of a seaman, and therefore had the legal status of a "Sieracki Seaman" (Seas Shipping Co. Inc. v. Sieracki, 328 U.S. 85 (1946)), which entitled him to the warranty of seaworthiness.

87. Defendants owed decedent a warranty of seaworthiness, which places an absolute non-delegable duty on them to provide decedent a vessel, equipment and appurtenances that were reasonably fit for their intended purposes.

88. Defendants breached this duty to decedent in the following respects:

    a.    Failing to provide a Pilot Boarding Arrangement, which was compliant with the SOLAS 74 Convention and as incorporated into Federal Statutes and Regulations, including all amendments and Resolutions, pre and post construction of the EAGLE TURIN, including but not limited to Chapter V Regulation 17, Regulation 23, Resolution A.899(21 and A.1045 (27), A.1108(29); and "best practices", "good and proper standards of marine practice", "safety standards", codes and guidelines and recommendations of classification societies and the maritime industry, hereinafter "SOLAS Instruments".

    b.    Failing to provide a safe means of ingress to and egress from the vessel.

    c.    Failing to provide a Pilot Transfer Arrangement to fulfill the purpose of enabling a pilot to embark and disembark safely.

d.      Failing to provide a combination arrangement in place of a single pilot ladder in disregard of the Pilot Line.

e.      Failing to provide Safe, Convenient, and Unobstructed Passage to the Point of Access on the Vessel.

f.      Failing to provide a safe gateway access to transfer from the pilot ladder to the main deck.

g.      Failing to provide safe and adequate handholds at the gateway access to the vessel.

h.      Failing to remove obstructions on handrail stanchions which inhibit adequate hand grasping.

i.      Failing to have a properly trained, outfitted, and positioned Responsible Officer and deck crew to fulfill the obligations imposed by SOLAS Instruments.

j.      Failure to identify and eliminate the risks of Pilot Transfer Arrangements created by arrangement, equipment and gear which are non-compliant with SOLAS Instruments.

k.      Failure to have and implement a proper and adequate Safety Management System relative to Pilot Transfer Arrangements and procedures.

l.      Failing to provide proper instructions, orders and training to vessel officers and crewmembers relating to Pilot Transfer Arrangements and procedures.

m.      Failing to provide adequate illumination for Pilot Transfer Arrangements.

n.      Failing to provide a vessel, appurtenances and equipment reasonably fit for their intended purpose.

o.      Failing to provide warnings to Captain Murray in regard to the foregoing.

p.  Operating a vessel with a Responsible Officer who abandoned his post and duties during the critical transfer between the pilot ladder to the vessel thereby exhibiting his lack of equal disposition and seamanship to ordinary men in this calling. And/or,

q.  In failing to exercise reasonable care under the circumstances and other particulars to be obtained during discovery and or presented at trial.

r.  In other particulars to be ascertained and determined during discovery.

89.  The foregoing failures, acts, omissions, deficiencies and conditions and non-conformities rendered the EAGLE TURIN unseaworthy.

90.  The foregoing failures, acts, omissions, deficiencies and conditions, and non-conformities constituted violations of SOLAS instruments which rendered the EAGLE TURIN unseaworthy "*per se"* thereby invoking the Pennsylvania Rule, (The Pennsylvania, 86 U.S. 125 (1873).).

91.  The confluence of the unseaworthy conditions caused Captain Murray to fall approximately 9 meters onto the steel deck of the launch of the AMERICA, resulting in grave injuries, conscious pain and suffering.

92.  Had the EAGLE TURIN provided a combination arrangement as required by SOLAS Instruments, not only would the accident have been avoided, but even if Captain Murray had fallen for any reason while climbing to the accommodation ladder platform, the distance of his fall would have been greatly reduced and he would have survived the fall sustaining relatively minor injuries.

93.  As a result of the wrongful death of decedent, plaintiff individually and on behalf of decedent's issue, claims all damages allowable under DOSHA including loss of support,

loss of services, loss of inheritance, loss of parental nurture, care and guidance, funeral expenses, and other pecuniary losses in an amount to be proven at trial.

**SECOND CAUSE OF ACTION FOR WRONGFUL DEATH ALLEGING NEGLIGENCE AND NEGLIGENCE PER SE UNDER DOHSA**

94.     Plaintiff repeats the allegations contained in paragraphs 1 to 93 with the same force and effect as if fully set forth herein.

95.     The foregoing failures, acts, omissions, deficiencies, and conditions constitute **negligence**.

96.     The foregoing failures, acts, omissions, deficiencies, and conditions constituting departures, non-conformities and or violations of SOLAS instruments constitute **negligence "*per se*"** thereby invoking the Pennsylvania Rule, (The Pennsylvania, 86 U.S. 125 (1873).).

97.     As a result of the wrongful death of decedent, plaintiff individually and on behalf of decedent's issue claims all damages allowable under DOSHA including loss of support, loss of services, loss of inheritance, loss of parental nurture, care and guidance, and other pecuniary losses, past and future. In an amount to be proven at trial.

**THIRD CAUSE OF ACTION *IN REM* AGAINST THE EAGLE TURIN ALLEGING NEGLIGENCE, NEGLIGENCE PER SE, UNSEAWORTHINESS, UNSEAWORTHINESS PER SE CAUSES OF ACTION FOR WRONGFUL DEATH UNDER DOHSA**

98.     Plaintiff repeats the allegations contained in paragraphs 1 to 97, with the same force and effect as if fully set forth herein.

99.     Plaintiff has a valid maritime lien against the EAGLE TURIN for her claims of negligence and unseaworthiness.

20

100.   Plaintiff individually and on behalf of decedent's issue, has and will sustain loss of support, loss of services, loss of inheritance, loss of nurture and guidance, funeral expenses, and other pecuniary losses, along with grief and loss of society, in amounts to be proven at trial, for which plaintiff has a maritime lien against the EAGLE TURIN.

**WHEREFORE Plaintiff prays for the following relief:**

a.   That the United Kingdom Mutual Steam Ship Assurance Association (Europe) Limited ("Steam Ship Association") file or cause to be filed an appearance on behalf of the EAGLE TURIN *in rem,* and her owners *in personam* without any jurisdictional defense and consent to jurisdiction.

b.   That judgment be entered against defendant AET INC. LTD and/or the owners of the EAGLE TURIN *in personam* in an amount to be proven at trial.

c.   That judgment be entered against defendant the EAGLE TURIN *in rem* in an amount to be proven at trial.

d.   That judgment be entered jointly and severally against the defendants in an amount to be proven at trial.

e.   That under the obligations imposed by the Letter of Undertaking the United Kingdom Mutual Steam Ship Association (Europe) Limited, be ordered to pay up to NINETEEN MILLION NINE HUNDRED THOUSAND DOLLARS ($19,900,000.00), the full amount of Letter of Undertaking, to satisfy a judgment entered *in rem* against the EAGLE TURIN and/or her owners *in personam*.  And,

f.   That plaintiff be awarded costs, prejudgment, and post judgment interest, together with such and other further relief as this Court deems just and proper.

Dated: New York, New York
September 21, 2022

**TABAK, MELLUSI & SHISHA LLP**

_____
Ralph J. Mellusi, Esq.
Jacob Shisha, Esq.
29 Broadway, Suite 2400
New York, NY 10006
(212) 962-1590

**GALLO VITUCCI KLAR LLP**

_____
Matthew Vitucci, Esq.
Richard Gonzalez, Esq.
90 Broad Street, 12 Floor
New York, New York 10004
(212) 683-7100

## VERIFICATION OF COMPLAINT

**ERIN F. MURRAY** states under penalty of perjury that:

1.      I am the plaintiff in the above complaint.

2.      I believe that all the allegations made in the complaint that I have personal knowledge of

are true.

3.      I believe that the allegations in the complaint that I do not have personal knowledge of

are true based on information and documentation provided by my attorneys.

Dated: Malverne, New York
September 21, 2022

ERIN F. MURRAY